**SCHULTE ROTH & ZABEL LLP**
Counsel to Brian, Dean, Neil, Ross and
Steve Blechman, Plaintiffs
919 Third Avenue
New York, New York 10022
Telephone (212) 756-2000

**SCARCELLA, ROSEN & SLOME LLP**
Counsel to Elyse, Linda, Helena, Robin and
Sharon Blechman, Plaintiffs
333 Earle Ovington Boulevard, 9th Floor
Uniondale, New York 11533
Telephone: (516) 227-1600

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x

|  |  |
|---|---|
| IN RE TL ADMINISTRATION CORPORATION, et al.  (f/k/a TWINLAB CORPORATION, et al.),<br><br>Debtors. | Chapter 11<br><br>Case No. 03-15564 (CB)<br>(Jointly Administered) |

------------------------------------------------------x

|  |  |
|---|---|
| BRIAN BLECHMAN, ROBIN BLECHMAN, DEAN BLECHMAN, SHARON BLECHMAN, NEIL BLECHMAN, HELENA BLECHMAN, STEVE BLECHMAN, ELYSE BLECHMAN, ROSS BLECHMAN AND LINDA BLECHMAN<br><br>Plaintiffs,<br><br>v.<br><br>TL ADMINISTRATION CORP. (F/K/A TWINLAB CORPORATION, INC.) AND TL ADMINISTRATION, INC. (f/k/a/ TWIN LABORATORIES, INC.)<br><br>Defendants. | Adv. Proceeding No. _____ |

----------------------------------------------------- x

## COMPLAINT FOR DECLARATORY JUDGMENT UNDER
## FEDERAL RULE OF BANKRUPTCY PROCEDURE 7001(2) and (9)

Plaintiffs Brian Blechman, Robin Blechman, Dean Blechman, Sharon Blechman, Neil Blechman, Helena Blechman, Steve Blechman, Elyse Blechman, Ross Blechman and Linda Blechman (collectively, the "Secured Creditors") as and for their complaint for a declaratory judgment regarding the validity, priority and extent of their secured claim allege as follows:

## Preliminary Statement

The Secured Creditors bring this adversary proceeding to obtain a declaratory judgment confirming their respective rights as holders of an allowed $15 million senior secured claim that is not subject to recharacterization, subordination, avoidance or any other challenge and that is entitled to interest, fees and costs under terms of a valid and enforceable Reimbursement Agreement (as defined below).

## Jurisdiction and Venue

1.    TL Administration, Corporation (f/k/a Twinlab Corporation) ("TLC"), TL Administration, Inc. (f/k//a Twin Laboratories Inc.) ("TLI") and TL Administration (UK) Ltd. (f/k/a Twin Laboratories (UK) Ltd.) filed petitions for relief under Chapter 11 of the Bankruptcy Code on September 4, 2003 (the "Petition Date").

2.    A creditors committee (the "Creditors' Committee") was appointed by the U.S. Trustee in these bankruptcy cases on September 17, 2003

3.    The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 157(a) and 1334(b).

4.    This is a "core" proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (K) and (O).

5.    Venue of this adversary proceeding in this district is proper pursuant to 28 U.S.C. § 1409(a) because the Debtors' bankruptcy cases are pending in this district.

2

6.     The basis for the relief requested in this Complaint is Federal Rule of Bankruptcy Procedure 7001(2) and (9).

## Factual Background

### A.     CIT Prepetition Facility

7.      TLI, The CIT Group/Business Credit, Inc. as agent and lender ("CIT") and certain other financial institutions entered into a Financing Agreement, dated March 29, 2001 (as amended from time to time, the "CIT Prepetition Facility").

8.     TLI's outstanding obligations under the CIT Prepetition Facility exceeded $27.5 million as of the Petition Date.

9.      TLI's obligations under the CIT Prepetition Facility were secured by liens on substantially all of the TLI's assets.

10.     TLI's obligations under the CIT Prepetition Facility were guaranteed by, among others, its parent company -- TLC.  TLC's guarantee obligation was similarly secured by liens to CIT on substantially all of TLC's assets.

11.     Pursuant to the *Final Order (A) Authorizing Postpetition Financing and Granting Security Interests and Superpriority Administrative Expense Status (B) Modifying the Automatic Stay and (C) Granting Adequate Protection* (the "Final DIP Order") [docket # 80] entered by the Court on September 26, 2003, the liens securing the CIT Prepetition Facility are "legal, valid, perfected, enforceable and unavoidable for all purposes" because no timely challenges or objections have been filed to the extent, validity, perfection or enforceability of those liens.  See Final DIP Order at Section 4.1.

12.     As set forth below, TLI and TLC's (collectively, the "Debtors") obligations were satisfied during the bankruptcy case.

**B.**     **$15 Million Letter of Credit**

13.     In connection with the CIT Prepetition Facility, CIT required that the Secured Creditors obtain for CIT's benefit a $15 million letter of credit.  CIT Prepetition Facility at § 2.1(m).

14.     The Secured Creditors complied with this requirement and caused Citibank, N.A. to issue to CIT "Irrevocable Letter of Credit No. NY-02728-30029658," dated April 12, 2001, in the aggregate amount of $15,000,000 (the "L/C"), a copy of which is attached hereto as Exhibit A.

**C.**     **Reimbursement and Security Agreement**

15.     In the event that the L/C were to be drawn, the Debtors agreed to reimburse the Secured Creditors pursuant to "Reimbursement and Security Agreement No. 2," dated April 6, 2001 (the "Reimbursement Agreement"), a copy of which is attached hereto as Exhibit B.

16.     Under the Reimbursement Agreement, the Debtors agreed to pay the Secured Creditors the costs and expenses (including reasonable attorneys' fees and consultants' fees) incurred in connection with the enforcement of any of their rights under the Reimbursement Agreement.  See Reimbursement Agreement at § 6.09.

17.     Under the Reimbursement Agreement, the Debtors also agreed to pay interest on all amounts due and owing to the Secured Creditors under the Reimbursement Agreement "until payment in full at the rate per annum equal to two percent per annum above the rate of interest announced publicly from time to time by Citibank, N.A., in New York, as its Base Rate, but in no event in excess of the maximum rate permitted by applicable law."  See Reimbursement Agreement at § 2.02.

18. To secure their obligations under the Reimbursement Agreement, the Debtors granted the Secured Creditors liens upon and security interests in (collectively, the "Liens") substantially all of their respective assets, including accounts, inventory, general intangibles, documents of title, equipment, real estate, stock of subsidiaries and proceeds of the foregoing (collectively, the "Collateral"). See Reimbursement Agreement at § 3.01.

19. The Liens were duly perfected by filing UCC-1 financing statements, mortgages and other perfection documents (collectively, the "Perfection Documents") in each of the appropriate jurisdictions. A schedule of the Perfection Documents is attached hereto as Exhibit C.

20. The Secured Creditors and CIT executed an "Amended and Restated Intercreditor Agreement," dated September 3, 2003 ("Intercreditor Agreement"), which amended and restated an "Intercreditor Agreement" between the parties dated April 10, 2001, pursuant to which the Secured Creditors agreed to subordinate their Liens to the liens granted by the Debtors to CIT to secure the Debtors' obligations under the CIT Prepetition Facility.

21. As a result of the closing of the sale to IdeaSphere described below, the Debtors' obligations to CIT have been satisfied in full and the Secured Creditors' Liens are now first priority claims and are no longer subject to subordination under the Intercreditor Agreement.

**D.    IdeaSphere Sale**

22. The Debtors sold substantially all of their respective assets (excluding assets relating to Ephedra based products) to Ideasphere, Inc. on December 19, 2003.

23. After satisfaction of CIT's claims against the Debtors, the sale generated net proceeds of at least $31 million (the "Proceeds").

24.     Pursuant to the order approving the sale to IdeaSphere (Docket No. 193) (the "Sale Order"), the Secured Creditors' Liens on the Collateral attached to the Proceeds "in the order of their priority, with the same validity, force, and effect which they now have against the Purchased Assets, subject to any claims and defenses the Debtors may posses with respect thereto." Sale Order at ¶7.

## E.     CIT Draws on L/C

25.     On the date of the closing of the sale to IdeaSphere and hours before the Proceeds from the IdeaSphere sale were paid to the Debtors, CIT drew down on the L/C.  On information and belief, the draw of the L/C by CIT was precipitated by a side agreement between CIT and the Creditors' Committee in which the Creditors' Committee agreed not to pursue any claims against CIT or assert any challenges to the extent and validity of the liens securing the CIT Prepetition Credit Facility in exchange for CIT's agreement to draw the L/C.  At the time of the draw, the L/C was entirely unnecessary because CIT's claims were over collateralized.  As such, at the time of the IdeaSphere closing, the L/C was no more than a superfluous credit enhancement device relating to obligations then owed by the Debtors to CIT.  In short, because the sale proceeds exceeded CIT's debt, CIT was well secured and had no need to seek recourse to the L/C for payment.

26.     The L/C proceeds (in the amount of $15 million) were paid by Citibank to CIT on December 19, 2003.  Consequently, the entire outstanding principal amount of the L/C together with accrued, interest, costs and expenses are now due in full.

## F.     Actual Controversy

27.     The Creditors' Committee has filed a "Motion for Order Authorizing [the Creditors' Committee] to Commence Adversary Proceeding Against the [Secured Creditors] and

Other Parties," dated December 1, 2003 (Docket No. 261) ("Delegation Motion").  In connection with the Delegation Motion, the Creditors' Committee delivered to the Debtors and Secured Creditors a draft complaint (the "Complaint") alleging claims against, among others, the Secured Creditors.  The Complaint is the subject of a protective order and has not been publicly filed. The Complaint seeks, among other things, to challenge the Secured Creditors' right to obtain payment from the estates on account of the claims arising under the Reimbursement Agreement.

28.     The claims asserted in the Complaint lack merit and have the prejudicial effect of clouding the Secured Creditors' right (individually and collectively) to obtain payment from the estates on account of the claims arising under the Reimbursement Agreement.

## FIRST CLAIM FOR RELIEF

29.     The Secured Creditors repeat and re-allege each and every allegation set forth above as if fully set forth herein.

30.     CIT's draw on the L/C triggered the Debtors' obligation to the Secured Creditors under the Reimbursement Agreement to pay the Secured Creditors the principal amount of $15 million plus interest, costs and other compensation (the "Reimbursement Claim").

31.     By reason of the recordation of the Perfection Documents, the Reimbursement Claim is secured by validly perfected and fully enforceable Liens.

32.     The Secured Creditors' Liens are first priority and are no longer contractually subordinated to CIT's liens because the Debtors' obligations to CIT have been satisfied in full.

33.     Pursuant to the Sale Order, the Secured Creditors' Liens attached to the Proceeds.

34.     The value of the Collateral (e.g., the Proceeds) exceeds the amount of the Reimbursement Claim by a substantial margin.

35.     By reason of the foregoing, the Secured Creditors are entitled to a judgment under Fed. Bankr. R. 7001(9) declaring that the Reimbursement Claim is legal, valid, binding, perfected, not properly subject to recharacterization, subordination, avoidance or otherwise subject to disallowance, in whole or in part, and not be subject to any further challenge.

36.     By reason of the foregoing, the Secured Creditors are entitled to a judgment under Fed. Bankr. R. 7001(9) declaring that the Secured Creditors are entitled under section 506(b) of the Bankruptcy Code to interest on the Reimbursement Claim at the rate set forth in the Reimbursement Agreement from December 19, 2003 until the date that such claim is indefeasibly paid in full.

37.     By reason of the foregoing, the Secured Creditors are entitled to a judgment under Fed. Bankr. R. 7001(9) declaring that the Secured Creditors are entitled to recover under section 506(b) of the Bankruptcy Code their respective costs and expenses (including reasonable attorneys' fees and consultant fees) incurred in connection with enforcing their rights under the Reimbursement Agreement.

38.     The Secured Creditors further are entitled to a determination that the Debtors should promptly pay the Reimbursement Claim and that such payment should not await the consummation of the Debtors' liquidating plan.  The delay in payment of the Reimbursement Claim burdens the estates (and its unsecured creditors) due to the continued accrual of interest on the Reimbursement Claim which the Secured Creditors estimate accrues in an amount in excess of $2,500.00 per day.[1]

---

[1]     Pursuant to the Reimbursement Agreement the Secured Creditors are entitled to collect interest on all unpaid Reimbursement Obligations, as such term is defined in the Reimbursement Agreement, at a rate of 2% per annum in excess of Citibank, N.A.'s published New York Base Rate.  The Secured Creditors have estimated a per diem of $2,499.00 on the $15,000,000 principal balance alone, exclusive of expenses and other obligations due which would increase the accrued amount payable, using an annual rate of 6% (Citibank's Prime rate as of January 22, 2004 plus 2%) using a 360-day year in accordance with the Reimbursement Agreement.

## SECOND CLAIM FOR RELIEF

39.     The Secured Creditors repeat and re-allege each and every allegation set forth above as if fully set forth herein.

40.     Each Secured Creditor is a signatory to the Reimbursement Agreement.

41.     Each Secured Creditor has a separate and independent legal right under New York law to enforce the Reimbursement Agreement and the Liens.

42.     Each Secured Creditor has a separate and independent legal right under New York law to obtain full payment of the Reimbursement Claim, provided however, that the estates' aggregate liability to the Secured Creditors (independently or together) cannot exceed $15 million plus interest, allowed costs, expenses and other compensation due to the Secured Creditors.

## THIRD CLAIM FOR RELIEF

43.     The Secured Creditors repeat and re-allege each and every allegation set forth above as if fully set forth herein.

44.     By virtue of payment of $15 million of the Debtors' obligations to CIT, the Secured Creditors (jointly and severally) hold a $15 million secured claim (plus interest, costs, and expenses) arising under common law principles of equitable subrogation and pursuant to 11 U.S.C. § 509(a) and such claim is not subject to recharacterization, subordination, avoidance or otherwise subject to disallowance, in whole or in part.

**WHEREFORE**, the Secured Creditors request the entry of a judgment declaring that:

(a)     the Reimbursement Claim is legal, valid, binding, perfected, not subject to recharacterization, subordination, avoidance or otherwise subject to disallowance, in whole or in part, and shall not be subject to any further challenge;

(b)     the Secured Creditors are entitled to interest (at the rate set forth in the Reimbursement Agreement) from December 19, 2003 until the Reimbursement Claim is indefeasibly paid in full;

(c)     the Secured Creditors are entitled to recover the fees and costs (including reasonable attorneys' fees and consultant fees) incurred in connection with the enforcement of their rights under the Reimbursement Agreement and that these fees and costs are properly included in the Reimbursement Claim;

(d)     the Debtors shall immediately pay the Reimbursement Claim;

(e)     each Secured Creditor has a separate and independent legal right to enforce the Reimbursement Agreement and Liens;

(f)     the Secured Creditors (jointly and severally) hold an allowed secured claim for $15 million (plus interest, costs and expenses) arising under common law principles of equitable subrogation and 11 U.S.C. § 509(a) and that such claim is not subject to recharacterization, subordination, avoidance or otherwise subject to disallowance, in whole or in part, and shall not be subject to further challenge;

(g)     as an alternative to their claim under the Reimbursement Agreement, each Secured Creditor has a separate and independent legal right to obtain full payment of the Reimbursement Claim, provided however, that the estates' aggregate liability to the Secured Creditors cannot exceed $15 million plus interest and allowed expenses; and

[Balance of Page Intentionally Left Blank]

(h)   granting other and further relief as is necessary.


Dated: New York, New York
        February 6, 2004


                                    **SCHULTE ROTH & ZABEL LLP**
                                    Counsel for Brian, Dean, Neil, Ross
                                    and Steve Blechman, Counsel as
                                    Plaintiffs and Secured Creditors


                                    By: */s/ James M. Peck*
                                    James M. Peck  (JMP-8220)
                                    David M. Hillman (DMH-8666)
                                    David C. Jensen (DCJ-3980)
                                    919 Third Avenue
                                    New York, New York  10022
                                    Telephone (212) 756-2000

                                    and

                                    **SCARCELLA, ROSEN &
                                    SLOME LLP**
                                    Counsel for Elyse, Linda, Helena,
                                    Robin and Sharon Blechman, as
                                    Plaintiffs and Secured Creditors


                                    By:*/s/ Louis A. Scarcella*
                                    Louis A. Scarcella (LS-3479)
                                    333 Earle Ovington Boulevard
                                    Ninth Floor
                                    Uniondale, New York 11533
                                    Telephone: (516) 227-1600

**Exhibit "A"**
**Letter of Credit**

# CITIBANK, N.A.
New York

## AGREEMENT FOR STANDBY LETTER OF CREDIT

In consideration of your issuance of an irrevocable letter of credit (the "Credit") in the form attached hereto as requested by the undersigned co-applicants (collectively, the "Applicant") on the Application attached hereto, Applicant unconditionally agrees with you ("Citibank") as follows:

1.   **Reimbursement.**   Applicant will pay Citibank the amount of each draft or other request for payment (each, a "Draft") drawn under the Credit, whether drawn before, on or, if in accordance with applicable law, after the expiry date stated in the Credit. Each such payment shall be made, (a) in the case of a time Draft or deferred payment obligation, without demand and sufficiently in advance of its maturity to enable Citibank to arrange for its cover in same day funds to reach the place where it is payable no later than the date of its maturity, and (b) in the case of a sight Draft, on demand.

2.   **Fees, Charges and Expenses.** Applicant will pay Citibank (a) fees and other charges on the Credit (for so long as Citibank shall be obligated under the Credit in accordance with applicable law) at such rates and times as Applicant and Citibank shall agree in writing and (b) on demand, all expenses including, without limitation, reasonable attorneys' fees which Citibank may pay or incur in connection with the Credit including, without limitation, the preparation, negotiation and delivery of this Agreement.

3.   **Payments; Interest on Past Due Amounts; Computations.** All amounts due from Applicant shall be paid to Citibank at 425 Park Avenue, 4th Floor, New York, New York 10022, Attention: PBG Credit Services and Control, (or such other address notified to Applicant in writing), without defense, setoff, cross-claim, or counterclaim of any kind, in United States Dollars and in same day funds, provided, however, that if any such amount is denominated in a currency other than United States Dollars, Applicant will pay the equivalent of such amount in United States Dollars computed at Citibank's selling rate for cable transfers to the place where and in the currency in which such amount is payable, or such other currency, place, form and manner acceptable to Citibank in its sole discretion. The amount of each Draft drawn under the Credit from the date of such draw (whether or not a demand for reimbursement for such amount has been made), as well as any other amount not paid on demand or otherwise when due hereunder, shall bear interest until paid in full at a daily fluctuating interest rate per annum equal to two percent per annum above the rate of interest announced publicly from time to time by Citibank in New York as Citibank's Base Rate, but in no event in excess of the maximum rate permitted by applicable law.   Unless otherwise agreed in writing as to the Credit, all computations of commissions, fees and interest shall be based on a 360-day year and actual days elapsed; provided, however, that if such computation shall cause the amount of interest payable hereunder to exceed the maximum rate of interest permitted by applicable law, all computations of interest shall be made upon the basis of a year of 365 or 366 days. Applicant authorizes Citibank and Salomon Smith Barney Inc. (the "Securities Intermediary") to charge any account of Applicant maintained by Citibank or the Securities Intermediary for any amount when due, including for fees, charges and expenses when due.

4.   **Additional Costs.** If Citibank reasonably determines that the introduction or effectiveness of, or any change in, any law or regulation or compliance with any guideline or request from any central bank or other governmental or quasi-governmental authority (whether or not having the force of law) affects or would affect the amount of capital or reserves required or expected to be maintained by Citibank or any corporation controlling Citibank and Citibank determines that the amount of such capital or reserve is increased or by or based upon the existence of the Credit, then Applicant shall pay Citibank on demand, from time to time additional amounts sufficient in Citibank's judgment to compensate for the increase. Citibank's certificate as to amounts due shall contain reasonable detail as to the calculation thereof and shall be conclusive, in the absence of manifest error.

5.   **Taxes.** All payments made to Citibank shall be made free and clear of and without deduction for any present or future taxes, levies, imposts, deductions, charges, or withholdings, and all related liabilities, excluding income and franchise taxes imposed by the jurisdiction of Citibank's head office issuing the Credit or any of its political subdivisions (all non-excluded taxes, levies, imposts, deductions, charges, withholdings and liabilities are called "Taxes"). If any Taxes shall be required by law to be deducted from or in respect of any sum payable under this Agreement, (a) the sum payable under this Agreement shall be increased as may be necessary so that after making all required deductions Citibank receives an amount equal to the sum Citibank would have received had no such deductions been required, (b) Applicant shall be responsible for payment of the amount to the relevant taxing authority, (c) Applicant shall indemnify Citibank on demand for any Taxes paid by Citibank and any liability (including penalties, interest and expenses) arising from its payment or in respect of such Taxes, whether or not such Taxes were correctly or legally assessed, and (d) Applicant shall provide Citibank with the original or a certified copy of the receipt evidencing each payment of Taxes within 30 days of the tax payment date.

6.   **Indemnification.** Applicant will indemnify and hold Citibank and its officers, directors, affiliates, employees, attorneys and agents (each, an "Indemnified Party") harmless from and against any and all claims, liabilities, losses, damages, costs and expenses including, without limitation, reasonable attorneys' fees and disbursements, other dispute resolution expenses (including fees and expenses in preparation for a defense of any investigation, litigation or proceeding) and costs of collection that arise out of or in connection with or by reason of: (a) the issuance of the Credit, (b) any payment or action taken or omitted to be taken in connection with the Credit including any action or proceeding seeking (i) to restrain any drawing under the Credit, (ii) to compel or restrain the payment of any amount or the taking of any other action under the Credit, (iii) to compel or restrain the taking of any action under this Agreement, or (iv) to obtain similar relief (including by way of interpleader, declaratory judgment, attachment, or otherwise), regardless of who the prevailing party is in any such action or proceeding, (c) the enforcement of this Agreement, (d) any change in the value of a foreign currency covered by the

Credit or (e) any act or omission, whether rightful or wrongful, of any present or future de jure or de facto government or governmental authority or any other cause beyond Citibank's control, except to the extent such claim, liability, loss, damage, cost or expense is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct. Applicant will pay on demand from time to time all amounts owing under this section.

7.   **Obligations Absolute; Limitations of Liability.** (a) Applicant's obligations under this Agreement (the "Obligations") shall be unqualified, irrevocable and payable in the manner and method provided for under this Agreement irrespective of any one or more of the following circumstances: (i) any lack of validity or enforceability of this Agreement, the Credit, or any other agreement, application, amendment, guaranty, document, or instrument relating thereto, (ii) any change in the time, manner or place of payment of or in any other term of all or any of the Obligations of Applicant or the obligations of any person or entity that guarantees the Obligations, (iii) the existence of any claim, setoff, defense or other right that Applicant may have at any time against any beneficiary or any transferee of the Credit (or any person or entity for whom any such beneficiary or transferee may be acting), Citibank or any other person or entity, whether in connection with any transaction contemplated by this Agreement or any unrelated transaction, or any claim by Citibank or Applicant against the beneficiary of the Credit for breach of warranty, (iv) any exchange, release or non-perfection of any security interest in the Pledged Account (as hereinafter defined) or other Collateral, or release or amendment or waiver of or consent to departure from the terms of any guaranty. or security agreement, for all or any of the Obligations, (v) any Draft, or other document presented under the Credit being forged, fraudulent or invalid, or any statement therein being untrue or inaccurate, (vi) any failure by Citibank to issue the Credit (or any amendment) as requested, provided Applicant shall have received a copy of the Credit (or such amendment) and shall not have provided Citibank with written notice of such failure within three business days of receipt thereof, and such failure is material and consequential. (vii) any previous Obligation, whether or not paid, arising from Citibank's payment against any Draft, certificate or other document which appeared on its face to be signed or presented by the proper party but was in fact signed or presented by a party posing as the proper party, (viii) payment by Citibank under the Credit against presentation of a Draft or other document that does not comply with the terms and conditions of the Credit provided that such payment shall not have constituted gross negligence or willful misconduct on the part of Citibank, and (ix) any action or inaction taken or suffered by Citibank or any of its correspondents in connection with the Credit or any relevant Draft, certificate, other document or any Property (as hereinafter defined), if taken in good faith (i.e. honesty in fact in the conduct or transaction concerned, "Good Faith") and in conformity with applicable U.S. or foreign law or letter of credit practices.   (b) Without limiting any other provision of this Agreement, Citibank and any of its correspondents: (i) may rely upon any oral, telephonic, telegraphic, facsimile, electronic, written or other communication believed in Good Faith to have been authorized by Applicant, whether or not given or signed by an authorized person, (ii) shall not be responsible for errors, omissions, interruptions or delays in transmission or delivery of any

message, advice or document in connection with the Credit, whether transmitted by courier, mail, telex, any other telecommunication, or otherwise (whether or not they be in cipher), or for errors in interpretation of technical terms or in translation (and Citibank and its correspondents may transmit Credit terms without translating them), (iii) shall not be responsible for the identity or authority of any signer or the form, accuracy, genuineness, falsification or legal effect of any Draft, certificate or other document presented under the Credit if such Draft, certificate or other document on its face appears to be in accordance with the terms and conditions of the Credit, (iv) shall not be responsible for any acts or omissions by or the solvency of the beneficiary of the Credit or any other person or entity, having any role in any transaction underlying the Credit, (v) may accept or pay as complying with the terms and conditions of the Credit any Draft, certificate or other document appearing on its face (A) to substantially comply with the terms and conditions of the Credit, (B) to be signed or presented by or issued to any successor of the beneficiary or any other person in whose name the Credit requires or authorizes that any Draft, certificate or other document be signed, presented or issued, including any administrator, executor, personal representative, trustee in bankruptcy, debtor in possession, liquidator, receiver, or successor by merger, or consolidation, or any other person or entity purporting to act as the representative of or in place of any of the foregoing, or (C) to have been signed, presented or issued after a change of name of the beneficiary, (vi) may disregard any requirement stated in the Credit that any Draft, certificate or other document be presented to it at a particular hour or place, (vii) shall not be responsible for the effectiveness or suitability of the Credit for Applicant's purpose, or be regarded as the drafter of the Credit regardless of any assistance that Citibank may, in its discretion, provide to Applicant in preparing the text of the Credit or amendments thereto, (viii) shall not be liable to Applicant for any consequential or special damages, or for any damages resulting from any change in the value of any foreign currency, services or goods or other property covered by the Credit, (ix) may assert or waive application of UCP (as defined below) Articles 17 (force majeure) and 45 (hours of presentation) and all other UCP articles primarily benefiting bank issuers, and (x) may honor a previously dishonored presentation under the Credit, whether pursuant to court order, to settle or compromise any claim that it wrongfully dishonored, or otherwise, and shall be entitled to reimbursement to the same extent as if it had initially honored plus (provided that such dishonor shall not have constituted gross negligence or willful misconduct on the part of Citibank) reimbursement of any interest paid by it. None of the circumstances described in this section shall place Citibank or any of its correspondents under any resulting liability to Applicant.

8.   **Independence.** Applicant acknowledges that the rights and obligations of Citibank under the Credit are independent of the existence, performance or nonperformance of any contract or arrangement underlying the Credit, including contracts or arrangements between Citibank and Applicant and between Applicant and the beneficiary of the Credit. Citibank shall have no duty to notify Applicant of its receipt of a Draft, certificate or other document presented under the Credit or of its decision to honor the Credit. Citibank may, without incurring any liability to Applicant or impairing its entitlement to reimbursement under this Agreement, honor the Credit despite notice from Applicant of, and without any

Page 2 of 8

duty to inquire into, any defense to payment or any adverse claims or other rights against the beneficiary of the Credit or any other person. Citibank shall have no duty to request or require the presentation of any document, including any default certificate, not required to be presented under the terms and conditions of the Credit. Citibank shall have no duty to seek any waiver of discrepancies from Applicant, nor any duty to grant any waiver of discrepancies which Applicant approves or requests. Subject to the Automatic Extension provisions herein, Citibank shall have no duty to extend the expiration date or term of the Credit or to issue a replacement letter of credit on or before the expiration date of the Credit or the end of such term.

9.  **Non-Documentary Conditions.** Citibank is authorized (but shall not be required) to disregard any non-documentary conditions stated in the Credit.

10.  **Transfers.** If, at Applicant's request, the Credit is issued in transferable form, Citibank shall have no duty to determine the proper identity of anyone appearing in any transfer request, Draft, or other document as transferee, nor shall Citibank be responsible for the validity or correctness of any transfer.

11.  **Extensions and Modifications of the Credit.** This Agreement shall be binding upon Applicant with respect to any extension or modification of the Credit made at Applicant's request or with Applicant's consent. Applicant's Obligations shall not be reduced or impaired in any way by any agreement by Citibank and the beneficiary of the Credit extending Citibank's time to honor or to give notice of discrepancies and any such agreement shall be binding upon Applicant.

12.  **Collateral.** (a) To secure the Obligations, Applicant hereby pledges and grants to Citibank a lien upon and a security interest in an account maintained by the Securities Intermediary in the name of Citibank Secured Party FBO Applicant, the number of which is specified below the Applicant's signature, and all financial assets deposited therein, all proceeds thereof and distributions in connection therewith, including stock dividends and the distributions on account of any stock, or other securities deposited in this account, which if not received directly by the Securities Intermediary, on behalf of Citibank, shall be delivered immediately by Applicant to the Securities Intermediary in form for transfer into this account (collectively, the "Pledged Account"; the Pledged Account and the Property on deposit therein being referred to hereinafter as "Collateral"). The word "Property" as used in this Agreement includes cash balances, securities consisting of uncertificated and book-entry securities, investment property and other financial assets, and all proceeds thereof. All Property held in the Pledged Account shall be treated as a financial asset under Article 8 of the Uniform Commercial Code. (b) Applicant will maintain Property in the Pledged Account having an aggregate loanable value as determined below ("Loanable Value") equal to the amount of the Credit (i.e., $15,000,000), as such amount shall be reduced from time to time ("Stated Amount"). If at any time the Loanable Value of Property in the Pledged Account exceeds the Stated Amount and no Event of Default (as defined below) has occurred and is continuing, Applicant may withdraw Property from the Pledged Account in excess of the amount then required to be maintained therein so long as the Market Value (as defined below)

of such Property is not less than $100,000 with respect to each such withdrawal, and upon the request of Applicant, Citibank shall provide the Securities Intermediary with any consent necessary to permit such withdrawal. So long as no Event of Default has occurred and is continuing, Applicant may enter into cash market trades, purchasing and selling securities in the Pledged Account, provided that, after giving effect to any such trade, the Stated Amount does not exceed the Loanable Value of the remaining Collateral. (c) The Loanable Value for each type of Collateral is at any time of determination the dollar equivalent of its aggregate "Market Value" (as defined below) multiplied by the percentage specified in the "Loanable Value" column provided in the Collateral Table attached as Schedule 1 hereto (the "Collateral Table") for that type of Collateral, except that pledged securities with a Market Value of less than US$10.00 per share shall be deemed to have no Loanable Value. The Market Value of (i) marketable securities shall be determined by reference to the most recent closing bid price reported by the applicable securities exchange or quoted by the National Association of Securities Dealers Automated Quotation System or on such other basis as Citibank or the Securities Intermediary, acting on behalf of Citibank, may reasonably determine and (ii) cash equivalents on any day shall be determined by reference to the most recent closing bid price reported by the applicable exchange or on such other basis as Citibank or the Securities Intermediary, acting on behalf of Citibank, may reasonably determine. If the Pledged Account contains more than one type of Collateral, the Loanable Value for the pool of Collateral is the sum of the Loanable Value for each type of Collateral. (d) If at any time the Stated Amount exceeds the sum of the amounts determined by multiplying the aggregate Market Value of each type of the Collateral times the percentage specified in the "Margin Call" column of the Collateral Table for that type of Collateral, then, within five business days of notice to Applicant of such event (a "Margin Call"), Applicant shall deposit additional Collateral into the Pledged Account so that, after giving effect to such deposit, the Stated Amount is not greater than the Loanable Value of the Collateral. (e) If at any time (i) the Stated Amount exceeds the sum of the amounts determined by multiplying the aggregate Market Value of each type of Collateral times the percentage specified in the "Sell-Out" column of the "Collateral Table" for that type of Collateral or (ii) Applicant has not satisfied the obligation to deposit additional Collateral as required in the event of a Margin Call, such occurrence shall be deemed an Event of Default under paragraph 17 below, and Citibank or the Securities Intermediary, acting on behalf of Citibank, shall have the immediate right, without notice or other action (notwithstanding any prior notice given under clause (d) above and notwithstanding anything to the contrary in paragraph 18 below), to exercise any or all of the remedies available to Citibank or the Securities Intermediary, acting on behalf of Citibank, under paragraph 18 below. (f) Without limitation of Citibank's rights and remedies Citibank has authorized the Securities Intermediary, acting on its behalf at any time that an Event of Default has occurred and is continuing, to sell, assign, transfer and deliver all or any part of the Property deposited in the Pledged Account or cancel any outstanding orders entered into in connection with the Pledged Account in any manner Citibank or the Securities Intermediary deems appropriate. Without limiting the generality of the foregoing, such sale or cancellation may be made in the sole discretion of Citibank or the Securities Intermediary on the exchange or other market where such business is then usually

Page 3 of 8

transacted, at public auction or at private sale, without advertising such sale or cancellation. All of the above may be done without demand or notice of sale or cancellation to Applicant. No demand or notice given to Applicant of intent to sell Property or to cancel orders in the Pledged Account, shall impose on Citibank or the Securities Intermediary any obligation to make such demand or provide such notice to Applicant. (g) Applicant agrees that Citibank may enter into one or more agreements with the Securities Intermediary or any other third party with possession or control over any Collateral that is acting as agent, pledge holder or otherwise on behalf of Citibank, which includes an agreement that permits the transfer of the Collateral only upon Citibank's direction and without Applicant's further consent. (h) (i) Citibank, at its option at any time and with or without notice, may have all or part of the Property in the Pledged Account transferred to or registered in the name of any of its nominees or the nominees of the Securities Intermediary; and (ii) Citibank or the Securities Intermediary shall be deemed to have exercised reasonable care with respect to the Property in the Pledged Account, if the Property in the Pledged Account is accorded treatment comparable to that which Citibank or the Securities Intermediary, respectively, gives to its own property of similar type, provided that Citibank or the Securities Intermediary shall have the right to delegate its obligations under this Agreement to such sub-agents, custodians and attorneys-in-fact as they shall deem appropriate, and Citibank or the Securities Intermediary, respectively, shall not be responsible for the negligence or misconduct of any sub-agents, custodians or attorneys-in-fact selected by it with reasonable care; and Citibank shall not be obligated to enforce or preserve its rights or Applicant's rights against any party or otherwise with respect to any Property in the Pledged Account.

**13. Additional Collateral.** If at any time Applicant shall seek to restrain or preclude payment of or drawing under the Credit or any court shall extend the term of the Credit or take any other action which has a similar effect, then, in each case, Applicant shall provide Citibank with other collateral of a type and value satisfactory to Citibank as security for the Obligations.

**14. Financing Statements; Further Assurances.** Citibank is authorized to file financing statements, amendments and continuation statements with or without notice to Applicant and with or without Applicant's signature, to perfect the security interests granted under this Agreement. Applicant agrees to sign financing statements on request and appoints Citibank in case of need to be its attorney-in-fact with full power of substitution to sign such financing statements in the name, place and stead of Applicant. In addition, Citibank may file photographic or other copies of this Agreement as financing statements. Applicant will, at its own expense upon request from time to time, sign any other instrument or document and take any other action as Citibank may require to perfect the security interests. Applicant further agrees to take all other action that Citibank reasonably requests to assure that it has a continuing perfected security interest in the Pledged Account until Citibank's liability under the Credit is extinguished and the Obligations are paid.

**15. Covenants of Applicant.** Until Citibank's liability under the Credit is extinguished and the Obligations are paid, Applicant will (a) comply with all U.S. and foreign laws, regulations and rules

(including foreign exchange control regulations, U.S. foreign assets control regulations and other trade-related regulations) now or later applicable to the Credit, transactions related to the Credit or Applicant's execution, delivery and performance under this Agreement, and deliver to Citibank, upon reasonable request, satisfactory evidence of such compliance, (b) inform Citibank immediately upon Applicant becoming aware of the occurrence of an Event of Default (as defined below), (c) not use the Credit for the purpose of purchasing, carrying or trading in margin stock, as defined in Regulation U of the Board of Governors of the Federal Reserve System, (d) not create or suffer to exist any lien, security interest or other charge or encumbrance, or any other type of preferential arrangement, upon or with respect to any Property in the Pledged Account, whether now owned or hereafter acquired other than in favor of Citibank or the Securities Intermediary, (e) not terminate or allow the termination of the Pledged Account or withdraw, sell or otherwise dispose of any Property in the Pledged Account except, so long as no Event of Default has occurred and is continuing, the Stated Amount would not exceed the Loanable Value of the Collateral after giving effect to such withdrawal, sale or other disposition, (f) furnish or cause to be furnished to Citibank, within 30 days after the end of each calendar year, such financial statements with respect to Applicant as Citibank shall reasonably request, which shall present fairly the financial condition of Applicant as of the end of the period covered thereby and which shall be certified by Applicant, together with such other information respecting the financial condition of Applicant as Citibank may from time to time reasonably request and (g) provide Citibank access to the books and financial records of Applicant from time to time to inspect and make copies of (at Applicant's expense) such books and records.

**16. Representations and Warranties of Applicant.** Applicant represents and warrants that (a) if Applicant is not an individual, it is duly organized, validly existing and in good standing under the laws of the jurisdiction in which it is organized; (b) its execution, delivery and performance of this Agreement (i) are within its capacity and powers, (ii) have been duly authorized by all necessary action, (iii) do not contravene any contract binding on or affecting it or any of its properties or its charter or other organizational documents, if any, (iv) do not violate any applicable law or regulation, and (v) do not require any notice, filing or other action to or by any governmental authority; (c) this Agreement is valid and binding upon Applicant; (d) there is no pending or threatened action which may materially adversely affect its financial condition or business or which purports to affect the validity or enforceability of this Agreement, the Credit or any transaction related to the Credit; (e) Applicant has good and marketable title to all Property in the Pledged Account free and clear of all liens, security interests, charges and other encumbrances other than in favor of Citibank or the Securities Intermediary; (f) all Property in the Pledged Account is freely marketable and not subject to any resale limitations (including any requirement to deliver a registration statement); (g) neither the granting of any collateral security for the Obligations, nor the issuance of the Credit, nor the making of any payment thereunder or the use of any proceeds thereof, constitutes or will constitute, or be part of, a preferential or fraudulent transfer or conveyance to any person or entity (including Citibank and the beneficiary of the Credit) under any applicable law, including Section 544, 547, 548 or 550 of the United States Bankruptcy

Code; and (h) the financial statements of Applicant or other financial information related to Applicant most recently provided to Citibank are true, correct and complete, and fairly present the financial condition of Applicant as of the date thereof (and do not reflect ownership by Applicant of any asset owned through a trust or any other indirect form of ownership), and since such date, there has been no material adverse change in such financial condition or in the financial affairs of Applicant or in the ability of Applicant to perform Applicant's obligations hereunder.   Each request by Applicant for a Credit shall constitute its representation and warranty that the foregoing statements are true and correct as if made on the date of such request.

17.   Default.  Each of the following shall be an "Event of Default" under this Agreement:  (a) Applicant's failure to pay when due (or, in the case of fees payable on account of the Credit, within five business days of the due date thereof) any obligation to Citibank or any of its subsidiaries and affiliates (under or in connection with this Agreement); (b) Applicant's failure to maintain collateral as required under Section 12 of this Agreement; (c) Applicant's failure to perform or observe any other term or covenant of this Agreement and such failure shall continue for fifteen days after written notice to Applicant; (d) Applicant's breach of any representation or warranty made in this Agreement or any financial statement, certificate or other document delivered by it under or in connection with this Agreement in any material respect; (e) Applicant's breach or default of Applicant's obligations under any agreement, if the effect of such breach or default is to cause the obligations thereunder to become due (or redeemable) or to permit the holder(s) of such obligations to declare them due (or require them to be redeemed) prior to their stated maturity; (f) institution by or against Applicant of any proceeding under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking the appointment of a receiver, trustee, or other similar official for Applicant or for any substantial part of its property provided that, in the case of any such proceedings commenced against Applicant, such proceeding remains undismissed for a period of sixty days; or (g) attachment or restraint of any Collateral.

18.   Remedies.  If any Event of Default shall have occurred and be continuing, the full amount of the Credit, as if a Draft for such full amount had been drawn, and any other Obligations, shall, at Citibank's option, become due and payable upon notice to Applicant, provided, however, that in the event of an actual or deemed entry of an order for relief with respect to Applicant under the U.S. Federal Bankruptcy Code, the amount of the Credit and any other Obligations shall automatically become due and payable without presentment, demand, protest or notice of any kind, all of which are hereby expressly waived by Applicant.  In addition to the remedies described in the immediately preceding sentence, if any Event of Default shall have occurred and be continuing, Citibank (i) may exercise in respect of the Collateral all the rights and remedies of a secured party on default under the Uniform Commercial Code as in effect in the State of New York and (ii) shall be entitled to remedies of specific performance and any other injunctive relief. At Citibank's request, Applicant will assemble the Collateral and make it available to Citibank at a place to be designated by Citibank which is reasonably convenient to Citibank and Applicant.  In addition, without notice except as specified below, Citibank may sell, or may direct the Securities Intermediary

to sell, any or all of the Collateral at public or private sale, at any of Citibank's offices or elsewhere, for cash, on credit or for future delivery (but without credit risk to Citibank), and at a price or prices and upon other terms and conditions as Citibank or the Securities Intermediary may deem commercially reasonable.  To the extent notice of sale of the Collateral shall be required by law, reasonable notification shall include, but not be limited to, written notice mailed or delivered to Applicant at the address specified in this Agreement five calendar days prior to the date of public sale or prior to the date after which private sale is to be made.  Any sale or other realization by Citibank or the Securities Intermediary shall be deemed commercially reasonable if made or conducted according to usual practices of commercial lenders liquidating similar collateral.  Any sale of securities by the Securities Intermediary, acting on behalf of Citibank, in connection herewith may be made without notice to Applicant if such sale is made on the exchange or market where such securities are usually sold, as determined in the Securities Intermediary's sole discretion. Any other Collateral that may speedily decline in value or that is sold on a recognized market may also be sold without notice to Applicant. Applicant expressly waives compliance with the provisions of Section 202 of the New York Lien Law for all purposes of this Agreement and the transactions contemplated hereby. Applicant shall pay Citibank on demand all costs and expenses (including reasonable attorneys' fees and legal expenses) related or incidental to the custody, preservation or sale of, collection from, or other realization upon, any of the Collateral or related or incidental to the establishment, preservation or enforcement of Citibank's rights with respect to the Collateral. Citibank may apply the proceeds of any sale of the Collateral to the reimbursement of any unreimbursed amounts drawn under the Credit and to the payment of all accrued and unpaid fees, costs and expenses under this Agreement or related hereto and may hold any remaining proceeds (up to 105% of the Stated Amount) in an interest-bearing account as Collateral and shall pay any such proceeds in excess of 105% of the Stated Amount to Applicant.  After Citibank's liability under the Credit is extinguished, and the Obligations are paid, Citibank shall pay any surplus to Applicant or to whomever may be lawfully entitled to receive the surplus and Applicant shall be liable for any deficiency.

19.   Setoff.  If any Event of Default shall occur and be continuing, Citibank may set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by Citibank to or for the credit or the account of Applicant ("Deposits") against any and all of the Obligations, irrespective of whether or not Citibank shall have made any demand under this Agreement and although such Deposits or Obligations may be unmatured or contingent.  Citibank's rights under this section are in addition to other rights and remedies (including other rights of setoff) which Citibank may have under this Agreement or applicable law.

20.   Waiver of Immunity.  Applicant acknowledges that this Agreement is, and the Credit will be, entered into for commercial purposes and, to the extent that Applicant now or later acquires any immunity from jurisdiction of any court or from any legal process with respect to itself or its property, Applicant now irrevocably waives its immunity with respect to the Obligations.

21.   Notices.  All notices hereunder shall be given in writing,

Page 5 of 8

including by telecopier or other facsimile transmission, or by telephone, confirmed immediately in writing (including by telecopier or other facsimile transmission). All written notices shall be sent by regular mail, by overnight delivery service, by hand-delivery, or by telecopier or other facsimile transmission. Applicant acknowledges and agrees that (i) all notices to Applicant will be sent to each of them, c/o Twinlab Corporation, at the address set forth on the signature page hereto, and (ii) if Applicant's address is changed, Applicant will immediately notify Citibank in writing as to such change in address. Further, Applicant acknowledges and agrees that if notices are sent to Applicant's telecopier number, they will be sent to the telecopier number provided below Applicant's signature line, which number may be changed upon written notification to Citibank. All notices shall be deemed given to Applicant, if sent by regular mail, three business days after being postmarked, if sent by overnight delivery service or by hand-delivery, when delivered at such address, even if refused, or, if sent by telecopier or other facsimile transmission, when transmission thereof is confirmed. All notices to Citibank will be sent to its address at 425 Park Avenue, 4th Floor, New York, New York 10022, Attention: PBG Credit Services and Control, (telephone no. (212) 559-6873) or to its telecopier number at (212) 793-1152, or such other address or telecopier number as Citibank may notify Applicant in writing, and shall be deemed given when received by Citibank.

22. Interpretation; Severability. If this Agreement is signed by two or more persons or entities, as Co-Applicant or otherwise, (i) each such person or entity shall be deemed an "Applicant" hereunder, (ii) each Applicant shall be jointly and severally liable for all the Obligations hereunder, and (iii) a default with respect to any Applicant shall be a default as to all Applicants in connection with this Agreement or Credit. For purposes herein, the term "including" means "including without limitation," and "business day" shall mean a day of the year on which national banks in New York City are not required or permitted by law to be closed. Headings are included only for convenience and are not interpretative. If any provision of this Agreement is held illegal or unenforceable, the validity of the remaining provisions shall not be affected.

23. Successors and Assigns. This Agreement shall be binding upon Applicant and its successors and permitted assigns, and shall inure to the benefit of and be enforceable by Citibank, its successors and assigns. Applicant shall not voluntarily transfer or otherwise assign any of its obligations under this Agreement. Citibank may transfer or otherwise assign its rights and obligations under this Agreement, in whole or in part, and shall be forever relieved from any liability with respect to the portion of Citibank's rights or obligations transferred or assigned. Applicant acknowledges and agrees that information pertaining to Applicant as it relates to this Agreement or the Credit may be disclosed to (actual or potential) transferees or assignee. This Agreement shall not be construed to confer any right or benefit upon any person or entity other than Applicant and Citibank and their respective successors and permitted assigns.

24. Modification; No Waiver. None of the terms of this Agreement may be waived or amended except in a writing signed by the party against whose interest the term is waived or amended. Forbearance, failure or delay by Citibank in the exercise of any power, right or remedy shall not constitute a waiver, nor shall any

exercise or partial exercise of any power, right or remedy preclude any further exercise of that or any other power, right or remedy. Any waiver or consent by Citibank shall be effective only in the specific instance and for the specific purpose for which it is given and shall not be deemed, regardless of frequency given, to be a further or continuing waiver or consent.

25. Multiple Role Disclosure; Information Disclosure. Citibank and its affiliates offer a wide range of financial services, including back-office letter of credit processing services on behalf of financial institutions and letter of credit beneficiaries. Our services are provided internationally to a wide range of customers, some of whom may be Applicant's counter-parties or competitors. Applicant acknowledges and accepts that Citibank and its affiliates, including Salomon Smith Barney, Inc., may perform more than one role in relation to a particular Credit. In particular, Citibank may retain and compensate Salomon Smith Barney, Inc. or any other affiliate to evaluate, hold, monitor and trade or liquidate, or cancel orders in connection with, the Property in the Pledged Account or any other Collateral, and neither Citibank nor any of its affiliates shall be liable for any such actions taken in the furtherance of Citibank's rights hereunder. Applicant acknowledges and agrees that information pertaining to Applicant which in any way relates to this Agreement or the Credit may be disclosed to any Citibank affiliates holding Collateral or providing services with respect to the Applicant or the Credit.

26. Only Agreement; Remedies Cumulative; Delivery by Facsimile. This Agreement constitutes the entire agreement between the parties concerning Citibank's issuance of a letter or letters of credit for Applicant's account and supersedes all prior simultaneous agreements, written or oral. All rights and remedies of Citibank under this Agreement and other documents delivered in connection with this Agreement are cumulative and in addition to any other right or remedy under this Agreement, the Credit or applicable law. This Agreement may be executed in counterparts and by the parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument. Delivery of a signed signature page to this Agreement by facsimile transmission shall be effective as, and shall constitute physical delivery of, a signed original counterpart of this Agreement.

27. Termination; Surviving Provisions. This Agreement shall be terminated only upon the extinguishment of Citibank's liability under the Credit and payment in full to Citibank of all Obligations hereunder. Restrictive provisions in this Agreement, such as indemnity, tax, immunity, and jurisdiction provisions shall survive termination of this Agreement.

28. Governing Law; Governing Guidelines. (a) This Agreement and the letter agreement of even date herewith between Applicant and Citibank with respect to the payment of fees for the issuance and maintenance of the Credit and the rights and obligations of Applicant and Citibank hereunder and thereunder shall be governed by and subject to the laws of the State of New York and applicable U.S. Federal laws. (b) Applicant agrees that Citibank may issue any Credit subject to the Uniform Customs and Practice for Documentary Credits, 1993 Revision, International Chamber of Commerce Publication No. 500 (the "UCP") or the International

Standby Practices, International Chamber of Commerce No. 590 (the "ISP") or, at Citibank's option, such later revision thereof in effect at the time of issuance of the Credit. The UCP or the ISP, as applicable, shall serve, in the absence of proof to the contrary, as evidence of general banking usage with respect to the subject matter thereof. (c) Applicant agrees that for matters not addressed by the UCP or the ISP, each Credit shall be subject to and governed by the laws of the State of New York and applicable U.S. Federal laws.

29.   **Jurisdiction; Service of Process.** Applicant now irrevocably submits to the non-exclusive jurisdiction of any state or federal court sitting in New York, New York, for itself, and in respect of any of its property. Applicant agrees not to bring any such action or proceeding against Citibank in any jurisdiction not described in the immediately preceding sentence.. Applicant irrevocably waives any objection to venue or any claim of an inconvenient forum. Applicant agrees that any service of process or other notice of legal process shall be deemed served if sent or delivered to the address specified for notices in paragraph 21. (If such address is an address outside the United States, the Applicant must provide an authorized agent in New York for service of process in the courts of the State of New York.) Applicant further agrees that nothing in this Agreement shall affect Citibank's right to serve process in any other manner permitted by law or to commence legal proceedings or otherwise proceed against Applicant in any other jurisdiction. Applicant agrees that final judgment against it in any action or proceeding shall be enforceable in any other jurisdiction within or outside the United States of America by suit on the judgment, a certified copy of which shall be conclusive evidence of the judgment.

30.   **LIMITATION ON DAMAGES.** NEITHER CITIBANK NOR THE SECURITIES INTERMEDIARY SHALL BE LIABLE FOR (A) ANY LOSS CAUSED DIRECTLY OR INDIRECTLY BY GOVERNMENT RESTRICTIONS, EXCHANGE OR MARKET RULINGS, SUSPENSION OF TRADING, WAR, STRIKES OR OTHER CONDITIONS BEYOND CITIBANK'S OR THE SECURITIES INTERMEDIARY'S CONTROL OR (B) ANY CONSEQUENTIAL, INCIDENTAL OR SPECIAL DAMAGES, EVEN IF SUCH DAMAGES ARE REASONABLY FORESEEABLE.

31.   **JURY TRIAL WAIVER.** APPLICANT AND CITIBANK IRREVOCABLY WAIVE THEIR RIGHTS TO A JURY TRIAL OF ANY CLAIM, COUNTERCLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, THE CREDIT OR ANY DEALINGS WITH ONE ANOTHER RELATING TO THE SUBJECT MATTER OF THIS AGREEMENT.

Co-Applicant's Name:

ROSS BLECHMAN

Signature: _____

LINDA BLECHMAN

Signature: _____

DEAN BLECHMAN

Signature: _____

SHARON BLECHMAN

Signature: _____

BRIAN BLECHMAN

Signature: _____

ROBIN BLECHMAN

Signature: _____

STEVEN BLECHMAN

Signature: _____

ELYSE BLECHMAN

Signature: _____

NEIL BLECHMAN

Signature: _____

HELENA BLECHMAN

Signature: _____

Standby Practices, International Chamber of Commerce No. 590 (the "ISP") or, at Citibank's option, such later revision thereof in effect at the time of issuance of the Credit. The UCP or the ISP, as applicable, shall serve, in the absence of proof to the contrary, as evidence of general banking usage with respect to the subject matter thereof. (c) Applicant agrees that for matters not addressed by the UCP or the ISP, each Credit shall be subject to and governed by the laws of the State of New York and applicable U.S. Federal laws.

28. Jurisdiction; Service of Process. Applicant now irrevocably submits to the non-exclusive jurisdiction of any state or federal court sitting in New York, New York, for itself, and in respect of any of its property. Applicant agrees not to bring any such action or proceeding against Citibank in any jurisdiction not described in the immediately preceding sentence. Applicant irrevocably waives any objection to venue or any claim of an inconvenient forum. Applicant agrees that any service of process or other notice of legal process shall be deemed served if sent or delivered to the address specified for notices in paragraph 21. (If such address is an address outside the United States, the Applicant must provide an authorized agent in New York for service of process in the courts of the State of New York.) Applicant further agrees that nothing in this Agreement shall affect Citibank's right to serve process in any other manner permitted by law or to commence legal proceedings or otherwise proceed against Applicant in any other jurisdiction. Applicant agrees that final judgment against it in any action or proceeding shall be enforceable in any other jurisdiction within or outside the United States of America by suit on the judgment, a certified copy of which shall be conclusive evidence of the judgment.

30. LIMITATION ON DAMAGES. NEITHER CITIBANK NOR THE SECURITIES INTERMEDIARY SHALL BE LIABLE FOR (A) ANY LOSS CAUSED DIRECTLY OR INDIRECTLY BY GOVERNMENT RESTRICTIONS, EXCHANGE OR MARKET RULINGS, SUSPENSION OF TRADING, WAR, STRIKES OR OTHER CONDITIONS BEYOND CITIBANK'S OR THE SECURITIES INTERMEDIARY'S CONTROL OR (B) ANY CONSEQUENTIAL, INCIDENTAL OR SPECIAL DAMAGES, EVEN IF SUCH DAMAGES ARE REASONABLY FORESEEABLE.

31. JURY TRIAL WAIVER. APPLICANT AND CITIBANK IRREVOCABLY WAIVE THEIR RIGHTS TO A JURY TRIAL OF ANY CLAIM, COUNTERCLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, THE CREDIT OR ANY DEALINGS WITH ONE ANOTHER RELATING TO THE SUBJECT MATTER OF THIS AGREEMENT.

Co-Applicant's Name:

ROSS BLECHMAN

Signature:_____

LINDA BLECHMAN

Signature:_____

DEAN BLECHMAN

Signature:_____

SHARON BLECHMAN

Signature:_____

BRIAN BLECHMAN

Signature:_____

ROBIN BLECHMAN

Signature:_____

STEVEN BLECHMAN

Signature:_____

ELYSE BLECHMAN

Signature:_____

NEIL BLECHMAN

Signature:_____

HELENA BLECHMAN

Signature:_____

Standby Practices, International Chamber of Commerce No. 590 (the "ISP") or, at Citibank's option, such later revision thereof in effect at the time of issuance of the Credit. The UCP or the ISP, as applicable, shall serve, in the absence of proof to the contrary, as evidence of general banking usage with respect to the subject matter thereof. (c) Applicant agrees that for matters not addressed by the UCP or the ISP, each Credit shall be subject to and governed by the laws of the State of New York and applicable U.S. Federal laws.

29. **Jurisdiction; Service of Process.** Applicant now irrevocably submits to the non-exclusive jurisdiction of any state or federal court sitting in New York, New York, for itself, and in respect of any of its property. Applicant agrees not to bring any such action or proceeding against Citibank in any jurisdiction not described in the immediately preceding sentence. Applicant irrevocably waives any objection to venue or any claim of an inconvenient forum. Applicant agrees that any service of process or other notice of legal process shall be deemed served if sent or delivered to the address specified for notices in paragraph 21. (If such address is an address outside the United States, the Applicant must provide an authorized agent in New York for service of process in the courts of the State of New York.) Applicant further agrees that nothing in this Agreement shall affect Citibank's right to serve process in any other manner permitted by law or to commence legal proceedings or otherwise proceed against Applicant in any other jurisdiction. Applicant agrees that final judgment against it in any action or proceeding shall be enforceable in any other jurisdiction within or outside the United States of America by suit on the judgment, a certified copy of which shall be conclusive evidence of the judgment.

30. **LIMITATION ON DAMAGES.** NEITHER CITIBANK NOR THE SECURITIES INTERMEDIARY SHALL BE LIABLE FOR (A) ANY LOSS CAUSED DIRECTLY OR INDIRECTLY BY GOVERNMENT RESTRICTIONS, EXCHANGE OR MARKET RULINGS, SUSPENSION OF TRADING, WAR, STRIKES OR OTHER CONDITIONS BEYOND CITIBANK'S OR THE SECURITIES INTERMEDIARY'S CONTROL; OR, (B) ANY CONSEQUENTIAL, INCIDENTAL OR SPECIAL DAMAGES, EVEN IF SUCH DAMAGES ARE REASONABLY FORESEEABLE.

31. **JURY TRIAL WAIVER.** APPLICANT AND CITIBANK IRREVOCABLY WAIVE THEIR RIGHTS TO A JURY TRIAL OF ANY CLAIM, COUNTERCLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, THE CREDIT OR ANY DEALINGS WITH ONE ANOTHER RELATING TO THE SUBJECT MATTER OF THIS AGREEMENT.

Co-Applicant's Name:

ROSS BLECHMAN

Signature:_____

LINDA BLECHMAN

Signature:_____

DEAN BLECHMAN

Signature: _Dean Blech_____

SHARON BLECHMAN

Signature:_____

BRIAN BLECHMAN

Signature: _Brian Blechman_____

ROBIN BLECHMAN

Signature:_____

STEVEN BLECHMAN

Signature:_____

ELYSE BLECHMAN

Signature:_____

NEIL BLECHMAN

Signature: _Neil Blechman_____

HELENA BLECHMAN

Signature: _Helena Blechman_____

Address for Notices to all Co-Applicants:

% Twinlab Corporation
150 Motor Parkway
Hauppauge, New York 11778
Attention:  Mr. Ross Blechman
Telephone No.:  (631) 647-3140
Telecopier No.:  (631) 630-3474

Co-Applicants' Account with Salomon Smith Barney Inc.
Pledged as Collateral pursuant to Paragraph 12 —
Citibank Secured Party FBO for the foregoing Co-Applicants:
(Account Number):  63018311-18-049

(For Citibank Use Only)

Item 159400 (SF 1427) Rev. 2/9

Page 8 of 8

# Citibank, N.A.

## NORTH AMERICAN TRADE FINANCE

Date: April 12, 2001

Beneficiary:

The CIT Group/Business Credit, Inc.
300 South Grand Avenue
Third Floor
Los Angeles, CA 90071

We , Citibank, N.A., hereby establish, at the request of Ross Blechman, Linda Blechman, Dean Blechman, Sharon Blechman, Brian Blechman, Robin Blechman, Steven Blechman, Elyse Blechman, Neil Blechman, and Helena Blechman (the "Blechmans") and for the account of the Blechmans, in your favor, as Agent under the Financing Agreement, dated March 29, 2001, among you (as Agent and Lender), the other financial institutions which may become parties thereto as Lenders and Twin Laboratories Inc., Advanced Research Press, Inc., Changes International, Inc., PR Nutrition, Inc., Health Factors International, Inc., and Bronson Laboratories, Inc (as Borrowers) (as amended and supplemented from time to time, the "Financing Agreement"), our Irrevocable Letter of Credit No. NY-02728-30029658 (this "Letter of Credit"), in the amount of $15,000,000.00 (as more fully described below) (such amount, as it may be reduced from time to time pursuant to the provisions hereof, the "Stated Amount"), effective immediately and expiring at the office of our Servicer, Citicorp North America, Inc. at 3800 Citibank Center, Building F, 1st floor, Tampa, Florida 33610 Attn. Standby Letter of Credit Unit or such other office as we may advise you from time to time (the "Office"), on April 30, 2002 (as such date may be extended pursuant to the fifth paragraph of this Letter of Credit, the "Termination Date").

Funds under this Letter of Credit are available to you against (a) your draft(s) at sight, marked "Drawn under Citibank, N.A. Irrevocable Letter of Credit No. NY-02728-30029658" and (b) a completed certificate purportedly signed by your officer in the form of Exhibit 1 hereto. Such draft(s) and certificate(s) shall be dated as of the date of presentation, which shall be made to the Office. Such draft(s) and certificate(s) need not be accompanied by the original of this Letter of Credit and need not be presented personally by you; i.e., the draft(s) and certificate(s) may be presented by messenger, registered mail (return receipt requested) or overnight delivery service.

1

# Citibank, N.A.

If your draft(s) and certificate(s) are received at the Office, all in strict conformity with the terms and conditions of this Letter of Credit, at or prior to 11:00 a.m., Tampa, Florida time, on a business day on or prior to the Termination Date, we will honor the same by 4:00 p.m., Tampa, Florida time, on the same business day in accordance with your payment instructions. If we receive your draft(s) and certificate(s) at the Office, all in strict conformity with the terms and conditions of this Letter of Credit, after 11:00 a.m., Tampa, Florida time, but prior to 4:00 p.m., Tampa, Florida time, on a business day prior to the Termination Date, we will honor the same by 9:30 a.m., Tampa, Florida time, on the next business day in accordance with your payment instructions. Payment under this Letter of Credit shall be made only by wire transfer of federal funds and only to your following account:

> Bank Name: Chase Manhattan Bank, N. A.
> ABA #: 021-000021
> A/C Name: The CIT Group/Business Credit/LA
> A/C #: 144054227
> REF: Twin Labs

As used herein, "business day" shall mean any day other than a Saturday or Sunday or a day on which banking institutions in the City of Tampa, Florida are authorized by law to close or are otherwise closed for business to the general public.

Each payment made by us hereunder shall permanently reduce the Stated Amount by the amount of such payment. The Stated Amount of this Letter of Credit shall be further permanently reduced from time to time, upon receipt at the Office, of a certificate in the form of Exhibit 2, attached hereto (each a "Reduction Certificate"), with blanks completed, purportedly signed by an authorized signatory of the Beneficiary and also purportedly signed by or on the behalf of a majority of the Blechmans. Each Reduction Certificate shall constitute full and conclusive authority and direction to us to reduce the Stated Amount of this Letter of Credit by the amount specified in such Reduction Certificate.

It is a condition of this Letter of Credit that it shall be deemed automatically extended, without amendment, for additional period(s) of one year from the then existing Termination Date, but not beyond April 30, 2004, unless 30 (thirty) days prior to any then existing Termination Date we notify you by certified mail (return receipt requested) or by any other receipted means that we elect not to consider this Letter of Credit renewed for any such additional period, whereupon you may draw your one sight Draft on us for an amount not to exceed then Stated Amount of this Letter of Credit, mentioning thereon our reference number.

We hereby agree to honor each Draft drawn under and in compliance with the terms and conditions of this Letter of Credit if presented, as specified, at the Office on or before the then existing Termination Date.

Should you have occasion to communicate with us regarding this Letter of Credit, please direct your correspondence to the Office, making specific mention of the Letter of Credit number indicated above.

2

# Citibank, N.A.

Except as far as otherwise expressly stated herein, this Letter of Credit is subject to the International Standby Practices ("ISP98"), International Chamber of Commerce, Publication No. 590, and as to matters not governed by the ISP98, shall be governed by and construed in accordance with the laws of the State of New York and applicable U.S. Federal Law.

CITIBANK, N.A.

AUTHORIZED SIGNATURE

# EXHIBIT 1

## CERTIFICATE FOR DRAWING

## UNDER LETTER OF CREDIT

The undersigned, a duly authorized officer of The CIT Group/Business Credit, Inc. (the "Agent"), hereby certifies to Citibank, N.A. (the "Bank"), with reference to Irrevocable Letter of Credit No. NY-02728-30029658 (the "Letter of Credit"; any capitalized term used herein and not otherwise defined herein shall have its respective meaning as set forth in the Letter of Credit) issued by the Bank in favor of the Agent that:

(1)     A Drawing Condition (as such term is defined in the letter agreement related to drawing conditions among the Agent and the Blechmans) has occurred and the Agent is making a drawing under the Letter of Credit.

(2)     The amount of the draft accompanying this Certificate does not exceed the lesser of (a) the Stated Amount and (b) the amount of the Obligations (as such term is defined in the Financing Agreement).

(3)     The proceeds of the drawing under the Letter of Credit will be applied to the Obligations.

IN WITNESS WHEREOF, the Agent has executed and delivered this Certificate as of the _____ day of _____, 200__

The CIT Group/Business Credit, Inc.

By:

(Name and Title)

4

## EXHIBIT 2

## CERTIFICATE OF REDUCTION

## UNDER LETTER OF CREDIT

Citibank, N.A.
c/o Citicorp North
America, Inc.
3800 Citibank Center
Building F, 1ˢᵗ Floor
Tampa, FL 33610

Re: Irrevocable Letter of Credit No. NY-02728-30029658

The undersigned, being respectively a duly authorized signatory of The CIT Group/Business Credit, Inc. (the "Beneficiary") and an authorized signatory on behalf of a majority of the Blechmans (or a majority of the Blechmans), hereby request Citibank, N.A. (the "Issuer") to reduce the Stated Amount of the above-referenced Letter of Credit by USD _____ [insert amount], pursuant to and in accordance with the terms and conditions of such Letter of Credit.

Unless otherwise defined herein, all capitalized terms used herein and defined in the above referenced Letter of Credit shall be used herein as so defined.

In witness whereof, the Beneficiary has caused its authorized signatory to execute and deliver, and a majority of the Blechmans have executed and delivered or have cause their authorized signatory to execute and deliver, this Certificate as of the ___ day of ____, 200___

The CIT Group/Business Credit, Inc.
"Beneficiary"

By: _____

Title: _____

Sworn to before me this _____ day of _____, 200__.

Notary public: _____

G00229



THE CITIBANK PRIVATE BANK

*Citibank, N.A.*          *PBG/US Investment Finance*

*425 Park Avenue*
*7th Floor/Zone 8*
*New York, NY 10022*


June 13, 2001


Ross and Linda Blechman
Dean and Sharon Blechman
Brian and Robin Blechman
Steven and Elyse Blechman
Neil and Helena Blechman
% Twinlab Corporation
150 Motor Parkway
Hauppauge, New York   11778

      Re:  <u>**Agreement for Standby Letter of Credit**</u>

Ladies and Gentlemen:

      Reference is made to Agreement for Standby Letter
of Credit dated April 6, 2001 (the "Letter of Credit
Agreement") among each of you and Citibank, N.A.
Capitalized terms used herein and not otherwise defined
herein shall have the meanings ascribed to such terms in the
Letter of Credit Agreement.

      This shall confirm that, effective as of the date
hereof, the second sentence of Section 12(b) of the Letter
of Credit Agreement is amended and restated as follows:

            "If at any time the Loanable Value of
      Property in the Pledged Account exceeds the Stated
      Amount and no Event of Default (as defined below)
      has occurred and is continuing, Applicant may
      withdraw Property from the Pledged Account in
      excess of the amount then required to be
      maintained therein so long as the Market Value (as
      defined below) of such Property is not less than
      $75,000 with respect to each such withdrawal, and
      upon the request of Applicant, Citibank shall
      provide the Securities Intermediary with any
      consent necessary to permit such withdrawal.  Any
      such withdrawal shall be made upon the written
      request (including by telecopier) of Ross Blechman
      or Neil Blechman, acting on behalf of all the
      undersigned co-applicants.  All Property withdrawn
      in accordance herewith shall be transferred to
      account number 630-19249-13-049 maintained by all

Mr. Ross Blechman, et al.
June 13, 2001
Page 2

of the undersigned co-applicants with the
Securities Intermediary."

Each of the undersigned hereby authorize and
appoint Ross Blechman and Neil Blechman, or either of them,
to act on their behalf in requesting withdrawals of Property
from the Pledged Account in accordance with Section 12(b) of
the Letter of Credit Agreement, as amended hereby.

Except as expressly amended hereby, the Letter of
Credit Agreement shall remain in full force and effect and
no other provision thereof shall be deemed to be waived or
modified hereby in any respect.

This letter agreement may be executed in
counterparts and by the parties hereto in separate
counterparts, each of which when so executed and delivered
shall be an original, but all of which shall together
constitute one and the same instrument. Delivery of a
signed signature page to this Agreement by facsimile
transmission shall be effective as, and shall constitute
physical delivery of, a signed original counterpart of this
letter agreement.

Please acknowledge your acceptance of the
foregoing by signing in the space provided below.

Very truly yours,

CITIBANK, N.A.

By:_____
       Robert F. Parker
       Vice President


AGREED TO AND ACCEPTED AS OF THIS
13TH DAY OF JUNE, 2001.

ROSS BLECHMAN

Signature: _Ross Blechman_____

Mr. Ross Blechman, et al.
June 13, 2001
Page 2

of the undersigned co-applicants with the
Securities Intermediary."

Each of the undersigned hereby authorize and
appoint Ross Blechman and Neil Blechman, or either of them,
to act on their behalf in requesting withdrawals of Property
from the Pledged Account in accordance with Section 12(b) of
the Letter of Credit Agreement, as amended hereby.

Except as expressly amended hereby, the Letter of
Credit Agreement shall remain in full force and effect and
no other provision thereof shall be deemed to be waived or
modified hereby in any respect.

This letter agreement may be executed in
counterparts and by the parties hereto in separate
counterparts, each of which when so executed and delivered
shall be an original, but all of which shall together
constitute one and the same instrument.  Delivery of a
signed signature page to this Agreement by facsimile
transmission shall be effective as, and shall constitute
physical delivery of, a signed original counterpart of this
letter agreement.

Please acknowledge your acceptance of the
foregoing by signing in the space provided below.

Very truly yours,

CITIBANK, N.A.

By:_____
    Robert F. Parker
    Vice President

AGREED TO AND ACCEPTED AS OF THIS
13TH DAY OF JUNE, 2001.

ROSS BLECHMAN

Signature:_____

Mr. Ross Blechman, <u>et al.</u>
June 13, 2001
Page 3


LINDA BLECHMAN

Signature: _____

DEAN BLECHMAN

Signature: _____

SHARON BLECHMAN

Signature: _____

BRIAN BLECHMAN

Signature: _____

ROBIN BLECHMAN

Signature: _____

STEVEN BLECHMAN

Signature: _____

ELYSE BLECHMAN

Signature: _____

NEIL BLECHMAN

Signature: _____

HELENA BLECHMAN

Signature: _____

**Exhibit "B"**
**Reimbursement Agreement**

## REIMBURSEMENT AND SECURITY AGREEMENT NO. 2

REIMBURSEMENT AND SECURITY AGREEMENT (this "Agreement"), dated as of April 1C, 2001, by and among Twinlab Corporation, a Delaware corporation ("Twinlab"), Twin Laboratories Inc., a Utah corporation ("TLI"), Advanced Research Press, Inc., a New York corporation ("ARP"), Changes International, Inc., a Florida corporation ("Changes"), PR Nutrition, Inc., a California corporation ("PRN"), Health Factors International, Inc., a Delaware corporation ("HFI"), Bronson Laboratories, Inc., a Delaware corporation ("Bronson," and, together with Twinlab, TLI, ARP, Changes, PRN and HFI, the "Companies"), and Ross Blechman, Linda Blechman, Dean Blechman, Sharon Blechman, Brian Blechman, Robin Blechman, Steven Blechman, Elyse Blechman, Neil Blechman and Helena Blechman (the "Blechmans").

WHEREAS, the Companies have entered into the Financing Agreement with CIT;

WHEREAS, as a financial accommodation to the Companies, to support the obligations of the Companies under the Financing Agreement, the Blechmans have obtained the Letter of Credit for their own accounts, such Letter of Credit naming CIT as beneficiary;

WHEREAS, to obtain the Letter of Credit, the Blechmans have entered into the Issuing Bank Reimbursement Agreement, pursuant to which the Blechmans have agreed, among other things, to pay the Issuing Bank Reimbursable Amounts to the Issuing Bank;

WHEREAS, to induce the Blechmans to obtain the Letter of Credit, the Companies have agreed to reimburse the Blechmans for any and all Reimbursement Obligations;

NOW, THEREFORE, in consideration of the premises and representations, warranties, covenants and agreements herein contained, and intending to be legally bound hereby, the parties hereby agree as follows:

### ARTICLE I.

### DEFINITIONS

Section 1.01.   Defined Terms. The following terms, as used herein, have the following meanings:

"Business Day" shall mean any day other than a Saturday or Sunday or other day on which commercial banking institutions in the City of New York are authorized by law to close or are otherwise closed for business to the general public.

"CIT" shall mean The CIT Group/Business Credit, Inc., as agent under the Financing Agreement.

"Collateral" shall have the meaning assigned to it in the Financing Agreement.

"Financing Agreement" shall mean the Financing Agreement, dated March 29, 2001, among CIT, CIT as agent for the lenders, any other party which becomes a lender thereto pursuant to Section 12.9 of the Financing Agreement, and the Companies, as the same may be amended, restated, supplemented, renewed, replaced or otherwise modified from time to time whether or not with the same agent or lenders and irrespective of any changes in the terms and conditions thereof.

"Government Order" shall mean any order, writ, rule, judgment, injunction, decree, stipulation, determination, decision, consent, agreement or award entered into by or with any governmental authority.

"Intercreditor Agreement" shall mean the Intercreditor Agreement, of even date herewith, among the Blechmans and CIT.

"Issuing Bank" shall mean any financial institution which is the issuer of any Letter of Credit.

"Issuing Bank Fees" shall mean all commissions, costs and expenses payable by the Blechmans (or any of them) to any Issuing Bank under any Issuing Bank Reimbursement Agreement, including, without limitation, (a) the letter of credit fee in an amount equal to 0.58% (2.58% during the continuance of an event of default) per annum (in the case of the Original Letter of Credit) and (b) such other normal and customary costs and expenses as are incurred or charged by any Issuing Bank in issuing, effecting payment under, amending or otherwise administering any Letter of Credit.

"Issuing Bank Reimbursement Agreement" shall mean the Application and Agreement for Standby Letter of Credit (including the Agreement for Standby Letter of Credit attached thereto) executed and delivered by the Blechmans in connection with the Original Letter of Credit, the letter agreement, dated April 6, 2001, between the Blechmans and Citibank, N.A., as each of the same may be amended, restated, supplemented, renewed, replaced or otherwise modified from time to time, and all other agreements with any Issuing Bank to which the Blechmans (or any of them) are parties, as the same may be amended, restated, supplemented, renewed, replaced or otherwise modified from time to time, in connection with the issuance or maintenance of any Letter of Credit.

"Issuing Bank Reimbursable Amounts" shall mean any and all amounts that the Blechmans (or any of them) are obligated to pay or repay to any Issuing Bank under any Issuing Bank Reimbursement Agreement, including, without limitation, in respect of any drawings made under any Letter of Credit, any interest thereon and any Issuing Bank Fees.

"Law" shall mean all applicable provisions of all constitutions, treaties, statutes, laws (including, but not limited to, common law), rules, regulations, ordinances, codes or orders of any governmental authority.

"Letter Agreement" shall mean the letter agreement, dated March 29, 2001, between CIT and the Blechmans respecting certain terms and conditions of the Letter of Credit, as the same may be amended, supplemented or otherwise modified.

-2-

K1.2:2092323.10

"Letter of Credit" shall mean the Irrevocable Letter of Credit No. NY-02728-30029658 (the "Original Letter of Credit"), in the original face amount of $15,000,000, issued for the account of the Blechmans by Citibank, N.A., to CIT, as beneficiary, as the same may be amended, supplemented or otherwise modified, and any letter of credit issued in substitution for or in replacement of, in whole or part, any Letter of Credit.

"Lien" shall mean any security interest, mortgage, pledge, hypothecation, assignment for security purposes, deposit arrangement for security purposes, encumbrance, lien (statutory or other), or similar arrangement of any kind or nature.

"Permitted Encumbrances" shall have the meaning assigned to it in the Financing Agreement.

"Permitted Lien" shall mean (a) the security interest granted to CIT pursuant to the Financing Agreement, (b) liens created hereunder and (c) the Permitted Encumbrances.

"Real Estate" shall have the meaning assigned to it in the Financing Agreement.

"Reimbursement Obligations" shall mean all Issuing Bank Reimbursable Amounts and any indebtedness, liability or obligation of any kind incurred by the Blechmans (or any of them) under or in connection with this Agreement or any Related Documents (or without limitation, those expenses set forth in Section 6.09

"Related Documents" shall mean each Letter of Credit, the Letter Agreement, the Issuing Bank Reimbursement Agreement and all other agreements, instruments and documents delivered in connection with any of the foregoing.

"UCC" shall mean the Uniform Commercial Code as in effect the State of New York, as the same may be amended from time to time.

## ARTICLE II.

## REIMBURSEMENT PROVISIONS

Section 2.01.  Letter of Credit.  (a)  Pursuant to the Issuing Bank Reimbursement Agreement, the Issuing Bank has agreed, simultaneously herewith, to issue the Original Letter of Credit.

Section 2.02.  Reimbursement Obligations.  The Companies jointly and severally agree to pay the Blechmans all Reimbursement Obligations.  Unless otherwise specified herein, Reimbursement Obligations shall be due and payable on demand.  Amounts payable hereunder by the Companies shall be payable without offset or counterclaim of any kind.  Interest shall be payable on any and all Reimbursement Obligations from the date such Reimbursement Obligations become payable until payment in full at a rate per annum equal to two per cent per annum above the rate of interest announced publicly from time to time by Citibank, N.A., in

New York as its Base Rate, but in no event in excess of the maximum rate permitted by applicable law.

Section 2.03. <u>General Provisions as to Payments</u>. The Companies shall make each payment of Reimbursement Obligations (other than Issuing Bank Fees) in immediately available funds not later than 1:00 p.m. (New York City time) on the date when due to the Blechmans at the address for notice specified in Section 6.03. Any payment received after 1:00 p.m. (New York City time) shall be deemed to have been made on the next succeeding Business Day for all purposes. If any Reimbursement Obligation shall be due on a day which is not a Business Day, it shall be made on the next succeeding day which is a Business Day and such extension time shall in such case be included in computing any interest if payable along with such payment. All interest and fees payable hereunder shall be computed on the basis of a 360-day year and assessed for the actual number of days elapsed. Notwithstanding the foregoing, the Companies shall pay the Issuing Bank Fees directly to the Issuing Bank in accordance with the instructions set forth in the Issuing Bank Reimbursement Agreement.

Section 2.04. <u>Obligations Absolute</u>. The Companies' obligations under this Agreement shall be absolute, unconditional and irrevocable, and shall be discharged strictly in accordance with the terms hereof, under all circumstances whatsoever, including, without limitation, the following circumstances:

(a)   any lack of validity or enforceability of any of the Related Documents or any other agreement, instrument or document relating thereto;

(b)   any amendment or waiver of or any consent to departure from all or any of the Related Documents;

(c)   the existence of any claim, setoff, defense or other rights which the Companies may have at any time against the Blechmans, any beneficiary or any transferee of the Letter of Credit, the Issuing Bank (other than the defense of payment to the Issuing Bank in accordance with the terms of this Agreement) or any other person or entity, whether in connection with this Agreement, the Related Documents or any unrelated transaction;

(d)   the existence of any claim, setoff, defense or other rights which the Blechmans may have at any time against the Issuing Bank or any other person or entity, whether in connection with this Agreement, the Related Documents or any unrelated transaction;

(e)   any statement or any other document presented under the Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect whatsoever; and

-4-

(f)   payment by the Issuing Bank under the Letter of Credit against presentation of a sight draft or certificate that does not comply with the terms of such Letter of Credit or payment by the Blechmans to the Issuing Bank under circumstances where such payment is not required by the Issuing Bank Reimbursement Agreement; and

(g)   any other circumstance or happening whatsoever, whether or not similar to any of the foregoing.

# ARTICLE III.

## COLLATERAL

Section 3.01.   <u>Grant of Security Interest</u>. As security for the prompt payment in full of all Reimbursement Obligations, each of the Companies hereby grants to the Blechmans a continuing lien upon and security interest in and to all of its right, title and interest in and to the Collateral. Without limitation, with such exceptions, if any, as may be acceptable to the Blechmans, the lien and security interest securing the Reimbursement Obligations shall include mortgages or deeds of trust on the Real Estate or real estate owned in fee or acquired in fee by any of the Companies on or after the date hereof. The lien and security interest granted to the Blechmans under or pursuant to this Agreement shall be junior and subordinated to the lien and security interest granted to CIT under the Financing Agreement in the manner provided in the Intercreditor Agreement.

Section 3.02.   <u>Covenants</u>.

The Companies covenant to the Blechmans as follows:

(a)   The Companies will, promptly upon request by the Blechmans, execute and deliver or use reasonable best efforts to give any notices, execute and file or procure any financing statements, mortgages, deeds of trust or other documents, all in form and substance reasonably satisfactory to the Blechmans, mark any chattel paper constituting Collateral, deliver any chattel paper or instruments constituting Collateral to the Blechmans and take any other actions that are necessary or, in the reasonable opinion of the Blechmans, desirable to perfect or continue the perfection and the priority of the Blechmans' security interest in the Collateral, to protect the Collateral against the rights, claims, or interests of third parties other than holders of Permitted Liens or to effect the purposes of this Agreement. The Companies hereby authorize the Blechmans to file any financing or continuation statements with respect to the Collateral without the signature of the Companies to the extent permitted by applicable law. The Companies also shall deliver to the Blechmans such mortgages and deeds of trust on the Real Estate or real estate owned in fee or acquired in fee on or after the date hereof as the Blechmans shall require to obtain a valid second lien hereon, subject only to Permitted Encumbrances. The Companies will pay all reasonable costs incurred in connection with any of the foregoing.

(b)     Except for the Permitted Liens, the Companies shall not directly or indirectly create, incur, assume or suffer to exist any Liens on or with respect to the Collateral.

Section 3.03.   Duty of Blechmans.   The sole duty of the Blechmans with respect to the custody, safekeeping and physical preservation of the Collateral in their possession, under Section 9-207 of the UCC or otherwise, shall be to comply with the specific duties and responsibilities set forth herein and to exercise reasonable care to assure the safe custody of the Collateral.   The powers conferred on the Blechmans in this Agreement are solely for the protection of their interests in the Collateral and shall not impose any duty upon the Blechmans to exercise any such powers.   None of the Blechmans shall be liable for any action lawfully taken or omitted to be taken by any of them under or in connection with the Collateral or this Agreement, except for their gross negligence or willful misconduct.

## ARTICLE IV.

## DEFAULTS AND REMEDIES

Section 4.01.   Events of Default.   Any of the following events or circumstances shall constitute an "Event of Default" hereunder:

(a)     failure by the Companies to pay any Reimbursement Obligation when due;

(b)     any Company shall (i) apply for or consent to the appointment for such Company of a receiver, trustee, custodian or liquidator of all or a substantial part of its assets, (ii) generally fail to pay, or admit in writing its inability to pay, its debts as they mature, (iii) make a general assignment for the benefit of creditors, (iv) be adjudicated a bankrupt or insolvent or (v) file a voluntary petition in bankruptcy or a petition or an answer seeking reorganization or an arrangement with creditors or to take advantage of any insolvency law or an answer admitting the material allegations of a petition filed against such Company in any bankruptcy, reorganization or insolvency proceeding or corporate action shall be taken by such Company for the purpose of effecting any of the foregoing or an order for relief under the federal Bankruptcy Code shall have been entered in respect of such Company or similar action shall have been taken or similar relief shall have been granted under the laws of any other country or jurisdiction;

(c)     without the application, approval or consent of the Blechmans, a proceeding shall be instituted, in any court of competent jurisdiction, seeking in respect of any Company: adjudication in bankruptcy, reorganization, dissolution, winding up, liquidation, a composition or arrangement with creditors, a receiver, custodian, liquidator or the like of such Company or of all or any substantial part of its assets, or other like relief in respect of such Company unless such proceeding is being contested by it in good faith, and the same shall continue unstayed and in effect for any period of 60 consecutive days; or

-6-

(d)    any "default" or "event of default" under the Financing Agreement or any Related Documents (as those terms are defined in the Financing Agreement or any such Related Document).

Section 4.02.  <u>Remedies Upon Event of Default</u>.  If an Event of Default occurs and is continuing, the Blechmans may, without notice to or demand upon the Companies:

(a)    declare all unpaid Reimbursement Obligations, together with the accrued interest thereon, to be, and the same shall thereupon become, immediately due and payable, without presentment, protest or further demand or notice of any kind, all of which are hereby expressly waived by the Companies; or

(b)    exercise their rights and remedies as a secured party under the UCC, including, without limitation, the right to take possession of the Collateral; or

(c)    take any other action permitted to be taken by them under this Agreement or under applicable law.

## ARTICLE V.

## REPRESENTATIONS AND WARRANTIES

Each of the Companies hereby represents, covenants and warrants to the Blechmans as follows:

Section 5.01.  <u>Existence, Power and Qualification</u>.  Such Company is a duly organized and validly existing company, has the power to own its properties and to carry on its business as is now being conducted, and is duly qualified to do business and is in good standing in every jurisdiction in which the character of the properties owned by it or in which the transaction of its business makes its qualification necessary.

Section 5.02.  <u>Power and Authority</u>.  Such Company has full power and authority to enter into and perform its obligations under this Agreement and to grant the security interest in the Collateral hereunder.  Such Company has taken all necessary action to authorize the execution, delivery and performance of this Agreement in accordance with its terms and to grant the security interest in the Collateral hereunder.

Section 5.03.  <u>Validity</u>.    This Agreement constitutes the legal, valid and binding obligation of such Company, enforceable against such Company in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, or other similar laws of general application relating to or affecting the enforcement of creditors' rights generally, and by general principles of equity.

Section 5.04.  <u>No Conflict</u>.  The execution, delivery and performance of this Agreement by such Company will not violate, conflict with, or constitute any default under any provision of (a) such Company's charter or by-laws, (b) any Law or Government Order applicable to such

Company or its properties or assets, or (c) any mortgage, agreement, contract or other undertaking or instrument to which such Company is a party or by which such Company's properties or assets are bound.

Section 5.05.  Pending Matters.  No action or investigation is pending or, to the best of such Company's knowledge, threatened before or by any court or administrative agency which might result in any material adverse change in the financial condition, operations or prospects of such Company.  Such Company is not in violation of any agreement, the violation of which might reasonably be expected to have a material adverse effect on its business or assets, and such Company is not in violation of any Governmental Order to which it is subject.

Section 5.06.  Title to Collateral.  Such Company is the legal and beneficial owner of the Collateral owned by it.  The security interest created hereby in the Collateral is a valid, enforceable and, upon delivery, in the case of Collateral in which a lien is perfected by delivery; appropriate notation, in the case of Collateral in which a lien is perfected by notation; and filing in the appropriate state and/or county office, in the case of Collateral in which a lien is perfected by filing, perfected security interest in the Collateral subject only to Permitted Liens.  As of the date hereof, there are no other Liens on the Collateral or any portion thereof, except for Permitted Liens, and no financing statement, notice of Lien, assignment or collateral assignment, mortgage or deed of trust covering the Collateral or any portion thereof exists or is on file in any public office, except with respect to Permitted Liens.

Section 5.07.  Survival of Representations and Warranties.  All representations and warranties made herein or made in any certificate delivered pursuant hereto shall survive the execution hereof or thereof.

## ARTICLE VI.

## MISCELLANEOUS

Section 6.01.  Term of Agreement.  This Agreement is effective commencing on the date hereof.  This Agreement shall remain in full force and effect until the later of (a) the date on which the Blechmans' obligations under the Related Documents are terminated or expired and (b) the date on which all Reimbursement Obligations of the Companies to the Blechmans have been irrevocably paid and satisfied in full.  Any other termination of this Agreement shall not terminate or otherwise affect in any way any liability or obligation of any party hereto to the extent such liability or obligation relates to events occurring or circumstances existing prior to or as of, or as a result of, such termination.

Section 6.02.  Method of Communication.  Except as otherwise provided in this Agreement, all notices and communications hereunder shall be in writing.  Any notice shall be effective if delivered by hand delivery or sent via telecopy, recognized overnight courier service or certified mail, return receipt requested, and shall be presumed to be received by a party hereto (a) on the date of delivery if delivered by hand or sent by telecopy, (b) on the next Business Day if sent by recognized overnight courier service and (c) on the third Business Day following the date sent by certified mail, return receipt requested.

Section 6.03.  Notices.  Notices to any party shall be sent to it at the following addresses, or any other address as to which all the other parties are notified in writing.

If to the Companies:

c/o Twin Laboratories Inc.
150 Motor Parkway, Suite 210
Hauppauge, New York 11788
Attention: John Bolt, Chief Financial Officer
Telephone No.: (631) 467-3140, ext. 8101
Telecopy No.: (631) 761-7110

With copies to:

Kramer Levin Naftalis & Frankel LLP
919 Third Avenue
New York, New York  10022-3903
Attention:  Howard A. Sobel, Esq.
Telephone No.: (212) 715-9326
Telecopy No.: (212) 715-8000

If to the Blechmans:

c/o Twin Laboratories Inc.
150 Motor Parkway, Suite 210
Hauppauge, New York 11788
Attention: Ross Blechman
Telephone No.: (631) 467-3140, ext. 8173
Telecopy No.: (631) 761-7110

With copies to:

Kelley Drye & Warren LLP
101 Park Avenue
New York, New York 10178
Attn: John Lynagh
Telephone No. (212) 808-7554
Telecopy No. (212) 808-7897

Section 6.04.  Amendments and Waivers.  None of the terms or provisions of this Agreement may be waived, amended, supplemented or otherwise modified except by a written instrument executed by the parties hereto.

Section 6.05.  Severability.  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

000120

Section 6.06. <u>Integration</u>. This Agreement and the other Related Documents represent the agreement of the parties hereto with respect to the subject matter hereof, and there are no promises, undertakings, representations or warranties by the parties hereto relative to subject matter hereof not expressly set forth or referred to herein or in the other Related Documents.

Section 6.07. <u>No Waiver; Cumulative Remedies</u>. No failure to exercise and no delay in exercising, on the part of the Blechmans, any right, remedy, power or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

Section 6.08. <u>Compensation</u>. In consideration for the obligations assumed by them pursuant to the this Agreement and the Related Documents, the Blechmans shall be entitled to receive compensation from the Companies in an amount to be approved by a majority of the directors of Twinlab other than the Blechmans, subject to compliance with any contractual obligations of the Companies.

Section 6.09. <u>Payment of Expenses; Indemnity</u>. The Companies shall (a) pay all reasonable out-of-pocket expenses of the Blechmans in connection with (i) the preparation, execution and delivery of this Agreement and each other Related Document, whenever the same shall be executed and delivered, (ii) the preparation, execution and delivery of any waiver, amendment or consent by the Blechmans relating to this Agreement or any other Related Document, including without limitation reasonable fees and disbursements of counsel for the Blechmans and (iii) the administration and enforcement of any rights and remedies of the Blechmans under this Agreement or any other Related Documents, including consulting with accountants and attorneys concerning the nature, scope or value of any right or remedy of the Blechmans hereunder or under any other Related Document or any factual matters in connection therewith, which expenses shall include without limitation the reasonable fees and disbursements of the Blechmans, and (b) defend, indemnify and hold harmless the Blechmans from and against any losses, penalties, fines, liabilities, judgments, settlements, damages, costs and expenses, suffered by any such person in connection with any claim, investigation, litigation or other proceeding (whether or not the Blechmans are a party thereto) and the prosecution and defense thereof, arising out of or in any way connected with this Agreement or any other Related Document, including without limitation, reasonable attorney's and consultant's fees of the Blechmans, except to the extent that any of the foregoing directly result from the gross negligence or willful misconduct of the party seeking indemnification therefor.

Section 6.10. <u>Successors and Assigns</u>. This Agreement shall be binding upon and inure to the benefit of the Blechmans and their respective successors and assigns, except that no party hereunder may assign or transfer any of its rights or obligations under this Agreement without the prior written consent of the other parties hereto.

KL2:2092323.10

Section 6.11.   <u>WAIVERS OF JURY TRIAL</u>.   THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT AND FOR ANY COUNTERCLAIM THEREIN.

Section 6.12.   <u>Section Headings</u>.   The section headings used in this Agreement are for convenience of reference only and are not to affect the construction hereof or be taken into consideration in the interpretation hereof.

Section 6.13.   <u>GOVERNING LAW</u>.   THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK WITHOUT GIVING EFFECT TO LAWS RELATING TO CONFLICT OF LAWS.

Section 6.14.   <u>Counterparts</u>.   This Agreement may be signed in any number of counterparts, each which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.

[SIGNATURE PAGE FOLLOWS]

KL2:2097323.10

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

TWINLAB CORPORATION

By: _____
Name:  John Bolt
Title: Chief Financial Officer

TWIN LABORATORIES INC.

By: _____
Name:  John Bolt
Title: Chief Financial Officer

ADVANCED RESEARCH PRESS, INC.

By: _____
Name: Steve Blechman
Title: CEO and President

CHANGES INTERNATIONAL, INC.

By: _____
Name: John Bolt
Title: Chief Financial Officer

PR NUTRITION, INC.

By: _____
Name: Ross Blechman
Title: CEO and President

HEALTH FACTORS INTERNATIONAL, INC.

By: _____
Name: Ross Blechman
Title: CEO and President

BRONSON LABORATORIES, INC.

By: _____
Name: Ross Blechman
Title: CEO and President

_____
Ross Blechman

_____
Linda Blechman

_____
Dean Blechman

_____
Sharon Blechman

_____
Brian Blechman

_____
Robin Blechman

_____
Steven Blechman

_____
Elyse Blechman

_____
Neil Blechman

_____
Helena Blechman

_____
Ross Blechman

_____
Linda Blechman

_____
Dean Blechman

_____
Sharon Blechman

_____
Brian Blechman

_____
Robin Blechman

_____
Steven Blechman

_____
Elyse Blechman

_____
Neil Blechman

_____
Helena Blechman

_____
Ross Blechman

_____
Linda Blechman

_____
Dean Blechman

_____
Sharon Blechman

_____
Brian Blechman

_____
Robin Blechman

_____
Steven Blechman

_____
Elyse Blechman

_____
Neil Blechman

_____
Helena Blechman

000124

_____
Ross Blechman


_____
Linda Blechman

_____
Dean Blechman

_____
Sharon Blechman


_____
Brian Blechman


_____
Robin Blechman

_____
Steven Blechman


_____
Elyse Blechman


_____
Neil Blechman


_____
Helena Blechman

**Exhibit "C"**
**Schedule of Perfection Documents**

## UCC Filings

| Debtor | Secured Party | Collateral | State | Jurisdiction | Debtor |
|---|---|---|---|---|---|
| Twin Laboratories, Inc. 150 Motor Parkway Hauppauge, NY 11788 | Brian, Dean, Elyse, Helena, Linda, Neil, Robin, Ross, Sharon, Steve Blechman 150 Motor Parkway Hauppauge, NY 11788 | Blanket lien (accounts receivables, commercial paper, equipment, inventory, intangibles, etc.) | UT | Secretary of State | 04/16/01 #43679200134 |
| Twin Laboratories, Inc. 150 Motor Parkway Hauppauge, NY 11788 | Brian, Dean, Neil, Ross, Steve, Linda, Sharon, Robin, Elyse, Helena 150 Motor Parkway Hauppauge, NY 11788 | Blanket lien (accounts receivables, commercial paper, equipment, inventory, intangibles, etc.) | UT | UT Div of Corporations and Commercial Code | 04/16/01 #01-712316 |
| Twin Laboratories, Inc. 150 Motor Parkway Hauppauge, NY 11788 | Brian, Dean, Neil, Ross, Steve, Linda, Sharon, Robin, Elyse, and Helena Blechman | Blanket lien (accounts receivables, commercial paper, equipment, inventory, intangibles, etc.) | NY | Dept. of State | 04/16/01 #073708 |

1

**UCC Filings**

| Debtor | Secured Party | Collateral | State | Jurisdiction | Original File Date and Number |
|---|---|---|---|---|---|
| Twinlab Corporation 150 Motor Parkway Hauppauge, NY 11788 | Brian, Dean, Neil, Ross, Steve, Linda, Sharon, Robin, Elyse, and Helena Blechman 150 Motor Parkway Hauppauge, NY 11788 | Blanket lien (accounts receivables, commercial paper, equipment, inventory, intangibles, etc.) | DE | Secretary of State of Delaware | 04/16/01 #1035140 8 |
| Twinlab Corporation 150 Motor Parkway Hauppauge, NY 11788 | Brian, Dean, Neil, Ross, Steve, Linda, Sharon, Robin, Elyse, and Helena Blechman 150 Motor Parkway Hauppauge, NY | Blanket lien (accounts receivables, commercial paper, equipment, inventory, intangibles, etc.) | N Y | Dept. of State | 04/16/01 #073719 |

2

## INTELLECTUAL PROPERTY FILINGS

| ENTITY | SECURED PARTY | INSTRUMENT | STATE | WHERE FILED | LOCATION |
|--------|---------------|------------|-------|-------------|----------|
| Twin Laboratories, Inc. 150 Motor Parkway Hauppauge, NY 11788 | Ross, Linda, Dean, Sharon, Brian, Robin, Steve, Elyse, Neil and Helena Blechman 150 Motor Parkway Hauppauge, NY 11788 | Patents, Trademarks, Copyrights, and Licenses | DC | US Patent & Trademark Office, D.C. | 05/25/01 Reel/Frame: 002311/0283 |

3

9564756.8

## INTELLECTUAL PROPERTY FILINGS

| ENTITY | SECURED PARTY | INSTRUMENT | STATE | WHERE FILED | LOCATION |
|---|---|---|---|---|---|
| Twin Laboratories, Inc. 150 Motor Parkway Hauppauge, NY 11788 | Ross, Linda, Dean, Sharon, Brian, Robin, Steve, Elyse, Neil and Helena Blechman 150 Motor Parkway Hauppauge, NY 11788 | Copyrights: Master Distributor System Reg. No. TX 3-356-662 Reg. Date:06/10/92 <br><br> Nature's Herbs Product Guide Reg. No. TX 4-999-722 Reg. Date: 07/08/99 <br><br> News From the Herbal Village Reg. No. TX-3-767-243 Reg. Date: 07/08/99 | DC | Library of Congress Copyright Office, D.C. | 06/18/01 Pages 924-930 06/18/01 |

4

95647S6.8

## INTELLECTUAL PROPERTY FILINGS

| ENTITY | SECURED PARTY | INSTRUMENT | STATE | WHERE FILED | LOCATION |
|---|---|---|---|---|---|
| Twin Laboratories, Inc. | Ross, Linda, Dean, Sharon, Brian, Robin, Steven, Elyse, Neil and Helena Blechman 150 Motor Parkway Hauppauge, NY 11788 | Trademark Registrations Trademark Applications Tradenames | DC | US Dept. of Commerce, Dept. of Patent and Trademark Office | 05/25/01 Reel/Frame: 002305/0001 |
| Twin Laboratories, Inc. | Ross, Linda, Dean, Sharon, Brian, Robin, Steve, Elyse, Neil and Helena Blechman 150 Motor Parkway Hauppauge, NY 11788 | Patent Dietary Supplement and Method of Using Same 09-263314 | DC | US Dept. of Commerce, Dept. of Patent and Trademark Office | 05/25/01 Reel/Frame: 011856/0879 |

5

95647756.8

**MORTGAGES, WARRANTS AND DEEDS OF TRUST**

| ENTITY | SECURED | DOCUMENT | STATE | PROPERTY LOCATION | FILING DATE AND NUMBER |
|---|---|---|---|---|---|
| Twin Laboratories, Inc. | Ross, Linda, Dean, Sharon, Brian, Robin, Steven, Elyse, Neil and Helena Blechman | Mortgage, Assignment of Rents, Security Agreement, Fixture Filing | NY | 2120 Smithtown Avenue Ronkonkoma, NY Suffolk County | 04/26/01 Vol. 19858, page 399 |
| Twin Laboratories, Inc. | Ross, Linda, Dean, Sharon, Brian, Robin, Steven, Elyse, Neil and Helena Blechman | Deed of Trust | UT | 763 East Utah Valley Drive (Lot 32) 741 East Utah Valley Drive (Lot 33) 756 East Quality Drive (Lot 37) | 04/20/01 Instrument #: 37543:2001 (Lots, 32, 33 &37) |

6

9564756.8